**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| KAMIYA WILLOUGHBY, derivatively on behalf of NATIONAL BEVERAGE CORP., <br><br> Plaintiff, <br><br> v. <br><br> NICK A. CAPORELLA, GEORGE R. BRACKEN, JOSEPH G. CAPORELLA, CECIL D. CONLEE, SAMUEL C. HATHORN, JR., and STANLEY M. SHERIDAN, <br><br> Defendants, <br><br> and <br><br> NATIONAL BEVERAGE CORP., <br><br> Nominal Defendant. | C.A. No. <br><br><br> **DEMAND FOR JURY TRIAL** |

**SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Kamiya Willoughby ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant National Beverage Corp. ("NBC" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Nick A. Caporella, George R. Bracken, Joseph G. Caporella, Cecil D. Conlee, Samuel C. Hathorn, Jr., and Stanley M. Sheridan (collectively, the "Individual Defendants" and together with NBC, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of NBC, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the

investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NBC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by NBC's directors and officers from July 17, 2014 through the present (the "Relevant Period").

2.      NBC is an acknowledged leader in the development, manufacturing, marketing and sale of a diverse portfolio of flavored beverage products. The Company's primary market focus is the United States, but it also distributes products in Canada, Mexico, the Caribbean, Latin America, the Pacific Rim, Asia, Europe and the Middle East. NBC was incorporated in Delaware in 1985 and began trading as a public company on the NASDAQ Stock Market in 1991. Some of the Company's brands include Faygo, Shasta, and LaCroix sparkling water.

3.      NBC maintains a corporate jet, a Falcon 2000EX N1NC aircraft. The aircraft is partly owned by and registered to Broad River Aviation, Inc. ("Broad River").

4.      Defendant Nick A. Caporella ("N. Caporella") is NBC's Chief Executive Officer and Board Chairman. He is also the President of Broad River.

5.      Defendant N. Caporella, who is a pilot, personally flies the Company's jet.

6.      Upon information and belief, Defendant N. Caporella uses the Company jet for personal travel, at the Company's cost. Defendant N. Caporella's use of the Company jet for

personal travel has not been disclosed in periodic filings with the SEC, nor have any related party transactions with Broad River disclosed.

7.      On May 4, 2017, the Individual Defendants caused the Company to issue a press release touting NBC's use of unique methods, "VPO (velocity per outlet) and VPC (velocity per capita)" to "create[] growth never before thought possible" (VPO and VPC are collectively referred to herein as the "Velocity Methods"). This was followed by a May 5, 2017 press release stating, in relevant part, that the Company's "impressive VPO calculator . . . is flashing solid green numbers as we bring FY2017 to a close."

8.      On December 8, 2017, the Company issued a press release announcing its financial and operating results for the period ended October 28, 2017. That same day, an analyst with Maxim Group assigned NBC stock a "sell" rating.

9.      On this news, the price per share of NBC stock dropped from a closing price of $112.75 on December 7, 2017 to close at $100.84 per share on December 8, 2017 -- a drop of 10.6%, or $11.91.

10.      The Company and the SEC exchanged correspondence regarding the Company's use of VPO and VPC metrics between January 26, 2018 and May 14, 2018. Such correspondence was publicly filed. The SEC sought clarity on the meaning and use of the Velocity Methods by NBC.

11.      On March 26, 2018, the SEC filed its second letter sent to NBC, indicating that the SEC was not satisfied with NBC's response to the SEC's initial letter. NBC's initial response declined to disclose details of how VPO and VPC are calculated. On the filing of the SEC's response, the price per share of NBC stock dropped from a closing price of $87.65 on March 23,

2018, the prior trading day, to close at $85.69 per share on March 26, 2018 -- a drop of 2.2%, or $1.96.

12.     After markets closed on June 26, 2018, *The Wall Street Journal* published an article discussing the SEC's inquiry into NBC's use of the Velocity Methods.

13.     On this news, the price per share of NBC stock dropped from a closing price of $109.94 on June 26, 2018 to close at $100.19 per share on June 27, 2018 -- a drop of 8.9%, or $9.75.

14.     On July 3, 2018, *The Wall Street Journal* ran another story on NBC, this time discussing two lawsuits filed against NBC and Defendant N. Caporella alleging that Defendant N. Caporella had, among other things, engaged in inappropriate touching of two pilots employed by or through NBC to fly the Company's jet alongside Defendant N. Caporella. The story was picked up that day by numerous other news outlets.

15.     On this news, the price per share of NBC stock dropped from a closing price of $109.94 on July 3, 2018 to close at $107.04 per share on July 6, 2018 -- a drop of 2.6%, or $2.90.

16.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

17.     During the Relevant Period, the Defendant N. Caporella ("N. Caporella") engaged in inappropriate touching of, and levied verbal abuse against, at least two pilots employed as second in command by or though NBC while flying the jet used for NBC business trips. In addition, Defendant N. Caporella engaged in assault and battery of one such pilot, and retaliated against him for attempting to report Defendant N. Caporella's actions within NBC (collectively, the "Hostile Work Environment Misconduct").

18.     During the Relevant Period, the Individual Defendants caused the Company to market LaCroix sparkling water as "all-natural," and "100% natural" despite the beverages containing, *inter alia*, ethyl butanoate, limonene, linalool and linalool propionate, which are synthetic compounds (the "Marketing Misconduct").

19.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to NBC, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2) NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5) Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, NBC's public statements were materially false and misleading at all relevant times.

20.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

21.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

22.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO") and Chairman, and its Executive Vice President - Finance to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action"), have subjected the Company and its CEO and Chairman to two separate lawsuits in the United States District Court for the Southern District of Florida and a lawsuit pending in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida asserting claims related to the Hostile Work Environment Misconduct (the "Misconduct Actions"), [1] have subjected the Company to a putative class action lawsuit pending in the Northern District of Illinois asserting claims related to the Marketing Misconduct (the "Consumer Class Action"), [2] the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

---

[1] These actions are *Huenefeld and Huenefeld v. National Beverage Corp. and Nicholas A. Caporella*, Docket No. 0:16-cv-62881 (S.D. Fla.), filed December 7, 2016 (the "Huenefeld Action"); *Vincent Citrullo v. National Beverage Corp, et al.*, Docket No. 0:17-cv-60225 (S.D. Fla.), filed January 27, 2017 (the "Citrullo Action"); and *Vincent Citrullo v. National Beverage Corp, et al.*, Docket No. CACE17022093 (Fla. Cir. Ct., 17th Cir, Broward County), filed December 6, 2017 (the "Citrullo State Action"). The Huenefeld Action was settled in January 2018 for an undisclosed sum. The Citrullo Action was refiled against Defendant N. Caporella, NBC, and Broad River in state court after the federal complaint was dismissed on jurisdictional grounds, resulting in the Citrullo State Action. An amended complaint was filed in the Citrullo Action on October 23, 2017, naming only NBC and Broad River as defendants. The parties to the Citrullo Action and Citrullo State Action reached a settlement of both actions in August 2018 involving a $99,000 payment to the plaintiff, which was approval by the United States District Court for the Southern District of Florida on September 24, 2018.
[2] *Rice v. National Beverage Corp. d/b/a LaCroix Sparkling Waters*, Docket No. 1:18-cv-07151 (N.D. Ill.).

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the directors having caused the Company to pay Defendant N. Caporella undisclosed compensation, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this District because NBC is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of NBC. Plaintiff has continuously held NBC common stock at all relevant times.

### Nominal Defendant NBC

30.     Nominal Defendant NBC is a Delaware corporation headquartered at 8100 SW Tenth Street, Suite 4000, Fort Lauderdale, Florida 33324. NBC stock trades on the NASDAQ under the ticker symbol "FIZZ."

31.     According to the Company's Schedule 14A filed with the SEC on August 27, 2018 ("2018 Proxy Statement"), Defendant Nick A. Caporella beneficially owns 73.4% of the Company's outstanding Common Stock. As a result, the Company is a "controlled company" within the meaning of the NASDAQ listing standards.

### Defendant N. Caporella

32.     Defendant N. Caporella has served as the Company's CEO and member of the Board of Directors since NBC was founded in 1985. He is currently the Chairman of the Board and the Chairman of both the Nominating Committee and the Strategic Planning Committee. Defendant N. Caporella also served as the Company's President until September 2002. Since January 1992, Defendant N. Caporella's services have been provided to the Company through a management company, Corporate Management Advisors, Inc. ("CMA"), an entity owned by Defendant N. Caporella. According to the Company's Schedule 14A filed with the SEC on August 28, 2017 (the "2017 Proxy Statement"), as of August 14, 2017, Defendant N. Caporella beneficially owned 34,244,585 shares of the Company's common stock, which represented

73.5% of the Company's outstanding stock as of that date.[3] Given that the price per share of the Company's common stock at the close of trading on August 14, 2017 was $111.82, N. Caporella owned over $3.8 ***billion*** worth of NBC stock.

33.     The 2018 Proxy Statement asserts Defendant N. Caporella does not receive cash compensation from NBC. Instead, his services "are provided to the Company by CMA and [his] cash compensation is based solely on and included within the management fee paid to CMA." In the fiscal year ended April 28, 2018, NBC paid CMA $9,757,340.

34.     The Company's 2018 Proxy Statement stated the following about Defendant N. Caporella:

> Nick A. Caporella has served as Chairman of the Board and Chief Executive Officer of the Company since the Company was founded in 1985. He also served as President until September 2002. Since January 1992, Mr. Caporella's services have been provided to the Company through a management company, Corporate Management Advisors, Inc. ("CMA"), an entity which he owns. (See "Management Services Agreement – Compensation" and "Certain Relationships and Related Party Transactions".) Mr. Caporella previously served as President and Chief Executive Officer (since 1976) and Chairman of the Board (since 1979) of Burnup & Sims Inc. until March 1994. Throughout his more than 50-year business career, he has founded or managed as the Chief Executive Officer successful companies and has served as a public company Chairman, Chief Executive Officer or President since 1976. Mr. Caporella has achieved many awards as a businessman, including induction into the Institute of American Entrepreneurs and receipt of the Horatio Alger Award. He is involved in many research projects which endeavor to advance the cure of children's cancer and currently serves on the Professional Advisory Board of St. Jude Children's Hospital. The Company was founded as a result of Mr. Caporella's vision and innovation, and his extraordinary career, entrepreneurial spirit, business acumen and civic leadership qualify him to serve on the Board.

---

[3] This figure includes 33,302,246 shares owned by IBS Partners Ltd. ("IBS"), a Texas limited partnership whose sole general partner is IBS Management Partners, Inc., a Texas corporation. IBS Management Partners, Inc. is owned by Defendant N. Caporella. By virtue of Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), Defendant N. Caporella would be deemed to beneficially own the shares of Common Stock owned by IBS. This figure also includes 27,056 shares held by the wife of Defendant N. Caporella as to which Defendant N. Caporella disclaims beneficial ownership.

**Defendant Bracken**

35.    Defendant George R. Bracken ("Bracken") has served as NBC's Executive Vice President – Finance since July 2012. Previously, he served as Senior Vice President – Finance from October 2000 to July 2012 and Vice President and Treasurer from October 1996 to October 2000. According to the 2017 Proxy Statement, as of August 14, 2017, Defendant Bracken beneficially owned 147,148 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on August 14, 2017 was $111.82, Bracken owned approximately $16.5 million worth of NBC stock.

36.    The 2018 Proxy Statement asserts Defendant Bracken does not receive cash compensation from NBC. Instead, his services "are provided to the Company by CMA and [his] cash compensation is based solely on and included within the management fee paid to CMA." According to the 2018 Proxy Statement, Defendant Bracken received $590,400 from CMA in the fiscal year ended April 28, 2018.

**Defendant J. Caporella**

37.    Defendant Joseph G. Caporella ("J. Caporella") has served as President of the Company since September 2002 and, prior to that date, served as Executive Vice President since January 1991. He has also served as the Company's Chief Operating Officer ("COO") since 2014. Defendant J. Caporella is the son of Defendant N. Caporella. According to the 2017 Proxy Statement, as of August 14, 2017, Defendant J. Caporella beneficially owned 452,240 shares of the Company's common stock, representing 1.0% of the Company's outstanding stock as of that date.[5] Given that the price per share of the Company's common stock at the close of trading on

---

[4] This figure includes 133,898 shares held by the George R. Bracken Trust dated February 6, 2015, a revocable trust of which Defendant Bracken is the grantor and trustee, and 13,250 shares issuable upon exercise of currently exercisable options.

August 14, 2017 was $111.82, J. Caporella owned approximately $50.6 million worth of NBC stock.

38.     For the fiscal year ended April 28, 2018, Defendant J. Caporella received $1,446,877 in compensation from the Company. This included $775,000 in salary, $665,000 in bonus, and $6,877 in all other compensation.

39.     The Company's 2018 Proxy Statement stated the following about Defendant J. Caporella:

> Joseph G. Caporella has served as President of the Company since September 2002 and, prior to that date, served as Executive Vice President since January 1991. He is the son of Mr. Nick A. Caporella. Since joining the Company in 1988, he has been involved in all aspects of the Company's operations, including procurement, supply chain management, distribution and sales leadership. Mr. Caporella's more than 30 years of experience in the beverage industry coupled with his extensive knowledge of the day-to-day business operations of the Company qualify him to serve on our Board.

**Defendant Conlee**

40.     Defendant Cecil D. Conlee ("Conlee") has served as a Company director since 2009 and is a member of the Audit Committee. He is the Chairman of the Compensation and Stock Option Committee and a member of both the Audit Committee and Strategic Planning Committee. According to the 2017 Proxy Statement, as of August 14, 2017, Defendant Conlee beneficially owned 54,496 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on August 14, 2017 was $111.82, Conlee owned approximately $6.1 million worth of NBC stock.

41.     For the fiscal year ended April 28, 2018, Defendant Conlee received $60,900 in compensation from the Company, in fees earned or paid in cash.

---

[5] This figure includes 44,640 shares issuable upon exercise of currently exercisable options.
[6] This figure includes 23,656 shares issuable upon exercise of currently exercisable options

42.     The Company's 2018 Proxy Statement stated the following about Defendant Conlee:

> Cecil D. Conlee is founder and chairman of The Conlee Company, an Atlanta, Georgia based investment firm. From 1990 until 2018 he served as chairman of CGR Advisors, a real estate investment advisory company. He served as a director of Oxford Industries, Inc., an international apparel design, sourcing and marketing company from 1985 until June 2011, and was a member of the Executive Committee and Chairman of the Audit Committee. He also served as a director of Central Parking Corp. from 1996 to 2006. Mr. Conlee has been a member of the Company's Strategic Planning Committee since 1995 and was a lead director of Burnup & Sims Inc. for more than 20 years. As a result, he gained unique knowledge and experience during the formative years of the Company. In addition, Mr. Conlee holds an MBA from Harvard University and is a Trustee Emeritus of Vanderbilt University. Mr. Conlee's education, business acumen, leadership skills, civic involvement and his knowledge and experience related to our Company qualify him to serve on our Board.

**Defendant Hathorn**

43.     Defendant Samuel C. Hathorn, Jr. ("Hathorn") has served as a company director since 1997, and previously served as a director from 1985 to 1993. He is the Chairman of the Audit Committee, Deputy Chairman of both the Compensation and Stock Option Committee and Nominating Committee, and a member of the Strategic Planning Committee. According to the 2017 Proxy Statement, as of August 14, 2017, Defendant Hathorn beneficially owned 98,006 shares of the Company's common stock.[7] Given that the price per share of the Company's common stock at the close of trading on August 14, 2017 was $111.82, Hathorn owned approximately $11 million worth of NBC stock.

44.     For the fiscal year ended April 28, 2018, Defendant Hathorn received $75,500 in compensation from the Company, in fees earned or paid in cash.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Hathorn:

---

[7] This figure includes 25,618 shares issuable upon exercise of currently exercisable options.

Samuel C. Hathorn, Jr. was employed by Trendmaker Homes, Inc. from 1981 until his retirement in September 2007. He served as President since 1983 and was appointed Chief Executive Officer in January 2007. Trendmaker Homes, Inc. was a Houston, Texas-based homebuilding and land development subsidiary of Weyerhaeuser Company. Mr. Hathorn has also held senior executive and financial positions with several public corporations and served as a director of Burnup & Sims Inc. (a former affiliate of the Company) from 1981 until 1997 and of Hartman Commercial Properties REIT, a publicly-traded real estate investment trust, from 2000 to 2005. Mr. Hathorn first served on the Company's Board of Directors from its inception in 1985 to September 1993 while also serving as a Burnup & Sims Inc. director and representative during the Company's formative years. He returned to our Board in June 1997 and has served as a director since that time. Mr. Hathorn's extensive expertise as a seasoned financial executive, his professional business acumen and his intimate knowledge of our business qualify him to serve on our Board.

**Defendant Sheridan**

46.     Defendant Stanley M. Sheridan ("Sheridan") has served as the Company's Director since 2009. He is the Deputy Chairman of the Audit Committee, and member of both the Compensation and Stock Option Committee and Nominating Committee. According to the 2017 Proxy Statement, as of August 14, 2017, Defendant Sheridan beneficially owned 44,008 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on August 14, 2017 was $111.82, Sheridan owned over $4.9 million worth of NBC stock.

47.     For the fiscal year ended April 28, 2018, Defendant Sheridan received $61,500 in compensation from the Company, in fees earned or paid in cash.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Sheridan:

Stanley M. Sheridan was employed by Faygo Beverages, Inc., a wholly-owned subsidiary of National Beverage Corp., from 1974 until his retirement in 2004. He joined Faygo Beverages, Inc. as Chief Financial Officer in 1974 and was

---

[8] This figure includes 32,704 shares held by Stanley M. Sheridan Living Trust dated April 10, 1995 of which Defendant Sheridan is trustee and principal beneficiary and 11,304 shares issuable upon exercise of currently exercisable options.

promoted to President in May 1987 when Faygo Beverages, Inc. was acquired by National Beverage Corp. He holds an MBA in Accounting and has served on the boards of various private companies and charitable organizations. Mr. Sheridan's retirement in 2004 and his absence from Faygo Beverages, Inc. qualify him as an independent director for the Company. Mr. Sheridan's more than 30 years of experience in the beverage industry and his professional management expertise as a chief executive in the soft drink industry make him extremely familiar with our business. These qualifications and his financial and accounting expertise qualify him to serve on our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

49.     By reason of their positions as officers and/or directors of NBC and because of their ability to control the business and corporate affairs of NBC, the Individual Defendants owed NBC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NBC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NBC and its shareholders so as to benefit all shareholders equally.

50.     Each director and officer of the Company owes to NBC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

51.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NBC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

52.     To discharge their duties, the officers and directors of NBC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of NBC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised NBC's Board at all relevant times.

54.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Moreover, the Company's directors had a duty not to cause the Company to waste corporate assets by paying themselves excessive compensation and benefits and engaging in the Hostile Work Environment Misconduct.

55.     To discharge their duties, the officers and directors of NBC were required to exercise reasonable and prudent supervision over the management, policies, practices, and

internal controls of the Company. By virtue of such duties, the officers and directors of NBC were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to NBC's own Code of Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how NBC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of NBC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NBC's operations would comply with all applicable laws and NBC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.      Each of the Individual Defendants further owed to NBC and the shareholders the duty of loyalty requiring that each favor NBC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.      At all times relevant hereto, the Individual Defendants were the agents of each other and of NBC and were at all times acting within the course and scope of such agency.

58.      Because of their advisory, executive, managerial, and directorial positions with NBC, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NBC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein, and the Company's directors caused the Company to waste corporate assets by paying Defendant N. Caporella undisclosed

compensation and benefits and engaging in or permitting the Hostile Work Environment Misconduct, resulting in litigation and settlement costs. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) engage in the Hostile Work Environment Misconduct; (iv) artificially inflate the Company's stock price; and (v) waste the Company's corporate assets by paying Defendant N. Caporella undisclosed compensation and engaging in or permitting the Hostile Work Environment Misconduct, thereby incurring litigation and settlement costs.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The Individual Defendants serving as directors also caused the Company to waste corporate assets by paying Defendant N. Caporella undisclosed compensation and benefits and engaging in or permitting the Hostile Work Environment Misconduct which led to litigation and settlement costs, including in the Huenefeld Action, Citrullo Action, and Citrullo State Action. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of NBC was a direct, necessary,

and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NBC, and was at all times acting within the course and scope of such agency.

## NBC'S CODE OF ETHICS

65.     The Company's Code of Ethics (the "Code of Ethics"), last revised August 2016, provides that "[t]he highest standards of ethical and business conduct are required of all Company employees at all times."

66.     Although the term employee is not defined within the Code of Ethics, the Code of Ethics covers officers and directors, as evidenced in a section titled, "Waivers and Accountability," which provides, in relevant part:

> ***Any changes to this policy and any waivers of this policy for or on behalf of any director, executive officer, or senior financial officer of the Company must be approved by the Company's board***, or by a committee of the board, to which authority to issue such waivers has been delegated by the board.

(Emphasis added.)

67.     The Company's Code of Ethics provides that the "[r]esponsibilities of all NBC employees" includes to "[t]ake action against illegal, improper or unethical behavior."

68.    The Code of Ethics provides that conflicts of interest situations include, among other things, "[p]lacement of business with a firm owned or controlled by an employee or his family."

69.    The Code of Ethics provides, in a section titled "Complete and Accurate Financial Records and Communications," that, among other things, "[n]o false or artificial statements or entries may be made for any purpose in the books and records of the Corporation or in any internal or external correspondence, memorandums, or communication of any type, including telephone or wire communications."

70.    That section continues, providing, in relevant part, that:

> *The management of the Company is primarily responsible for the integrity of financial information and for ensuring that all* disclosures in reports filed with SEC and other *public communications are full, fair, accurate, and timely and that such disclosures are not misstated due to fraud or error*.

> Each officer or other employee with access to, or responsibility for, accounting or financial information relating to the Company shall promptly bring to the attention of the office of the General Counsel any information he or she may have concerning the following: (i) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data accurately; or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

(Emphasis added.)

71.    The Code of Ethics provides, in a section titled "Preservation of Assets and Cost Consciousness," in relevant part, that:

> NBC's policies provide for reimbursement of reasonable expenses incurred by employees who travel on authorized business or to Corporation-sponsored events. Economies of travel should be practiced at all times in the selection of air carriers, vehicle rentals, accommodations and expenditures for meals. First class air fare or lavish hotels, cars, etc. are not permissible.

> ***Employees shall not use Company property and services for their personal benefit unless use of such Company property and services has been properly approved for general employee or public use**. **The use of Company-owned** land, materials, **vehicles**, equipment, etc., **under any other circumstances, must be properly approved in advance**. Company property must not be sold, loaned, given away or otherwise disposed of - regardless of condition or value - without proper authorization.

(Emphasis added).

    72.    The Code of Ethics provides, in a section titled "Positive Work Environment,"

that:

> ***The Company has an anti-harassment policy committed to providing a positive work environment for all of its employees. Any type of harassment, whether of a racial, sexual, ethnic, or other nature, is absolutely prohibited.*** The Company actively enforces its policy against harassment and employees are encouraged to review that policy in detail. The policy applies to all conduct on the Company's premises and to all conduct off the Company's premises that affects an employee's work environment. ***It applies not only to relationships with and conduct toward other employees; it also applies to how employees conduct themselves with respect to*** representatives of suppliers, customers, and ***others with whom the Company has business relations***. The Company considers violation of the policy to be a serious offense that will lead to discipline, up to and including discharge.
>
> ***Harassment comes in many forms and may be physical, verbal, mental, or emotional. Generally, it is any conduct directed toward another person that, when viewed by a reasonable person, would or could be perceived as objectionable. Harassment includes creating a hostile work environment or permitting one to exist***.
>
> An employee will not suffer adverse employment consequences from making or taking part in the investigation of a good faith complaint concerning harassment. ***Any form of retaliation, including, but not limited to, derogatory comments, is strictly against Company policy***.

(Emphasis added.)

    73.    With regard to reporting violations, the Code of Ethics provides, in relevant part,

that:

> When you are uncertain about any situation, ask for guidance**. *If you believe there may have been a violation of the policy, you should discuss the matter with your manager or supervisor.*** If you are not comfortable doing that or believe that

doing so would not be effective, you should report your concerns to the office of the General Counsel. The General Counsel will investigate all reports received and take appropriate action. If a violation of this policy has occurred, the Company will take such disciplinary action, including dismissal, as it deems appropriate. . . . ***The Company forbids retaliation against employees who report violations of this policy in good faith.***

(Emphasis added.)

74.    The Code of Ethics provides, with respect to "Compliance and Discipline," in relevant part, that:

> ***Failure to comply with the standards contained in this Code will result in*** disciplinary action that may include probation, termination, referral for criminal prosecution, and/or ***reimbursement to NBC for any losses or damages resulting from the violation***.
>
> * * *
>
> ***Disciplinary action will be taken:***
>
> • Against employees who authorize or participate directly or indirectly in actions which are a violation of this Code.
>
> • Against any employee who may have deliberately failed to report a violation or deliberately withheld relevant and material information concerning a violation of this Code.
>
> • Against the violator's managerial superiors, to the extent that the circumstances of the violation reflect improper management supervision.
>
> • ***Against any supervisor who retaliates, directly or indirectly, or encourages others to do so, against an employee who reports a violation of this Code***.

(Emphasis added.)

75.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

Moreover, in violation of the Code of Ethics, the Individual Defendants engaged in or permitted the Hostile Work Environment Misconduct, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, properly report violations of the Code of Ethics, and engaged in retaliation against individuals for reporting violations of the Code of Ethics.

## NBC'S AUDIT COMMITTEE CHARTER

76.     The Company's Audit Committee Charter provides that the responsibilities of the Audit Committee include, *inter alia*:

> • Review and discuss earnings press releases, as well as financial information (the chair of the Committee may represent the Committee for purposes of this review);
>
> • Reviewing the reports of the independent auditors to assess the adequacy of the Company's system of internal control;
>
> • Obtaining from the independent accountants and internal auditors their recommendations regarding internal controls and other matters relating to the accounting procedures and the books and records of the Company and its subsidiaries and reviewing the correction of controls deemed to be deficient;
>
> • Providing an independent, direct communication between the Board, internal auditors and independent accountants;
>
> • Reviewing with appropriate Company personnel the actions to ensure compliance with the Company's Code of conduct [9] and the results of confirmations and violations of such Code . . .

77.     In contravention of their duties as members of the Audit Committee, Defendants Sheridan, Hathorn, and Conlee failed to effectively review the effectiveness of the Company's internal controls, ensure compliance with the Company's Code of Ethics, and allowed the Company to operate with inadequate internal controls.

---

[9] Upon information and belief, the Audit Committee Charter, which was last updated April 2007, is referring to the Code of Ethics. In support of this contention, Plaintiff points to the fact that there is no reference to a Code of Conduct on the Company's website or in the Company's periodic reports or proxy statements filed in the past year.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     NBC is a beverage developer, manufacturer, and distributor primarily focused on flavored soft drinks. Some of the Company's brands are Faygo, Shasta, Rip It energy drinks, Everfresh juice, and LaCroix sparkling water.

79.     Defendant N. Caporella not only serves as the Company's CEO and Chairman, but also pilots the Company jet, a Falcon 2000EX N1NC aircraft (the "Falcon 2000").

80.     The Falcon 2000 is partly owned by and registered to Broad River Aviation, Inc. ("Broad River").

81.     Broad River is incorporated in North Carolina. Public records indicate that Defendant N. Caporella is the President of Broad River, and Defendant Bracken is its Vice President.

82.     Upon information and belief, Defendant N. Caporella uses the Falcon 2000 for personal travel, at NBC's cost. However, this travel benefit is not disclosed in the Company's periodic filings with the SEC.

### The Hostile Work Environment Misconduct

83.     The Company hires trained pilots to fly alongside Defendant N. Caporella as his second-in-command ("SIC").

84.     The plaintiffs in the Misconduct Actions (the "Victim Pilots") were employed by or through NBC. The plaintiff in the Huenefeld Action alleges that he was paid by NBC, received NBC employee materials, and was issued an NBC health care card for himself and his family. The plaintiff in the Citrullo Action alleges that he was jointly employed by NBC and Broad River, and NBC had complete control over his hours and responsibilities.

85.     The Victim Pilots flew with Defendant N. Caporella on flights taken for the purpose of Company business and for Defendant N. Caporella's private business. According to the complaint in the Huenefeld Action, trips taken for Defendant N. Caporella's personal benefit were funded by NBC.

86.     The Victim Pilots have filed lawsuits against Defendant N. Caporella and NBC, claiming, among other things, that Defendant Caporella touched them in an inappropriate and sexually suggestive manner while serving as Defendant N. Caporella's SIC between 2014 and 2016. This touching included Defendant N. Caporella placing his hand on each man's inner thigh, and moving it upward toward the genitals in a sexually suggestive manner.

87.     In addition to such sexually suggestive touching, both Victim Pilots allege that Defendant N. Caporella engaged in a pattern of verbally abusive behavior against them.

88.     According to the complaint filed in the Huenefeld Action, Defendant N. Caporella subjected one of the Victim Pilots to assault and battery following one flight, leading the pilot to seek medical treatment and report the incident to the Traverse City, Michigan police department.

89.     According to the complaint filed in the Huenefeld Action, Defendant N. Caporella has committed assault and battery against other NBC employees in the past, and those employees were paid bonuses in connection with those incidents.

90.     According to both Misconduct Actions, violations of the Code of Ethics, including the Hostile Workplace Misconduct, were reported to Vince Caporella, a son of Defendant N. Caporella. These reports were ignored or downplayed.

91.     The complaint in the Huenefeld Action alleges that Huenefeld was retaliated against for reporting the Hostile Work Environment Misconduct through reduction in salary and, ultimately, termination.

92.     The Huenefeld Action was settled in January 2018 for an undisclosed sum.

93.     The parties to the Citrullo Action and Citrullo State Action have reached a settlement pertaining to both actions, under which NBC and Broad River admitted no liability and Broad River is to pay $99,000 to the plaintiff. The settlement was approved by the United States District Court for the Southern District of Florida on September 24, 2018

**The Marketing Misconduct**

94.     The Individual Defendants caused the Company to market LaCroix sparkling water as "all-natural," and "100% natural." Contrary to these representations, LaCroix sparkling waters contain synthetic compounds, including, *inter alia*, ethyl butanoate, limonene, linalool and linalool propionate.

**False and Misleading Statements**

*2013-2014 10-K*

95.     On July 17, 2014, the Company filed an annual report with the SEC for the fiscal year and quarter ended May 3, 2014 on Form 10-K (the "2013-2014 10-K") providing the Company's financial results and position. The 2013-2014 10-K was signed by Defendants N. Caporella, Bracken, J. Caporella, Conlee, Hathorn, and Sheridan. The 2013-2014 10-K reported net revenue of $641.1 million, net income of $43.6 million, and diluted earnings per share of $0.92.

96.     Regarding LaCroix, the 2013-2014 10-K stated, in relevant part, "100% all natural LaCroix® Sparkling Water is setting the pace in the Sparkling Water segment that is fast becoming the alternative to traditional carbonated soda."

97.     The 2013-2014 10-K noted that the Company's Code of Ethics is available on its website. As noted above, the Code of Ethics prohibits, among other things, workplace

harassment. Upon information and belief, such prohibitions were in the Code of Ethics when the 2013-2014 10-K was filed.

98.     Individual Defendants caused the Company to assert in the 2013-2014 10-K that NBC's internal control over financial reporting was effective. The 2013-2014 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) of the Exchange Act. Under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of our internal control over
> financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission in 1992. Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of May 3, 2014.

99.     As to the Company's disclosure controls and procedures, the 2013-2014 10-K provided:

> As of the end of the period covered by this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")). Based upon that evaluation, the Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective to ensure information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Principal Financial Officer, to allow timely decisions regarding required disclosure.

100.     Attached to the 2013-2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants N. Caporella and Bracken attesting to the accuracy of the 2013-2014 10-K.

### *2014-2015 10-K*

101.     On July 16, 2015, the Company filed an annual report with the SEC for the fiscal year and quarter ended May 2, 2015 on Form 10-K (the "2014-2015 10-K") providing the

Company's financial results and position. The 2014-2015 10-K was signed by Defendants N. Caporella, Bracken, J. Caporella, Conlee, Hathorn, and Sheridan. The 2014-2015 10-K reported net revenue of $645.8 million, net income of $49.3 million, and diluted earnings per share of $1.05.

102.    Regarding LaCroix, the 2013-2014 10-K stated, in relevant part, "100% all natural LaCroix® Sparkling Water is setting the pace in the Sparkling Water segment that is fast becoming the alternative to traditional carbonated soda."

103.    The 2014-2015 10-K noted that the Company's Code of Ethics is available on its website. As noted above, the Code of Ethics prohibits, among other things, workplace harassment. Upon information and belief, such prohibitions were in the Code of Ethics when the 2014-2015 10-K was filed.

104.    Individual Defendants caused the Company to assert in the 2014-2015 10-K that NBC's internal control over financial reporting was effective. The 2014-2015 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) of the Exchange Act. Under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of May 2, 2015.

105.    As to the Company's disclosure controls and procedures, the 2014-2015 10-K provided:

> As of the end of the period covered by this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")). Based upon that evaluation, the Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective to ensure

information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Principal Financial Officer, to allow timely decisions regarding required disclosure.

106.    Attached to the 2014-2015 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants N. Caporella and Bracken attesting to the accuracy of the 2014-2015 10-K.

***2015-2016 10-K***

107.    On July 14, 2016, the Company filed an annual report with the SEC for the fiscal year and quarter ended May 3, 2016 on Form 10-K (the "2015-2016 10-K") providing the Company's financial results and position. The 2015-2016 10-K was signed by Defendants N. Caporella, Bracken, J. Caporella, Conlee, Hathorn, and Sheridan. The 2015-2016 10-K reported net revenue of $704.8 million, net income of $61.2 million, and diluted earnings per share of $1.31.

108.    Regarding LaCroix, the 2015-2016 10-K stated, in relevant part:

***100% all natural LaCroix® Sparkling Water***, our strategically largest and fastest-growing brand, has set the pace in the Sparkling Water category that is rapidly becoming the alternative to traditional carbonated soda. With *zero* calories, *zero* sweeteners and *zero* sodium, the *innocence* of LaCroix has propelled it to the top-selling all natural domestic sparkling water. LaCroix has the support of national chains in multiple channels, including mass merchants, mainstream supermarkets and natural and specialty food retailers and has a flourishing social media presence. ***Flavored with natural fruit essence, LaCroix has expanded its core line*** with five new offerings - Coconut, Mango, Apricot, Passionfruit and Tangerine.

(Emphasis added.)

109.    The 2015-2016 10-K noted that the Company's Code of Ethics is available on its website. As noted above, the Code of Ethics prohibits, among other things, workplace harassment. Upon information and belief, such prohibitions were in the Code of Ethics when the 2015-2016 10-K was filed.

110.     Individual Defendants caused the Company to assert in the 2015-2016 10-K that

NBC's internal control over financial reporting was effective. The 2015-2016 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal
> control over financial reporting, as such term is defined in Rule 13a-15(f) of the
> Exchange Act. Under the supervision and with the participation of our
> management, including our Chief Executive Officer and Principal Financial
> Officer, we conducted an evaluation of the effectiveness of our internal control
> over financial reporting based on the framework in *Internal Control – Integrated
> Framework* issued by the Committee of Sponsoring Organizations of the
> Treadway Commission in 2013. Based on that evaluation, our management
> concluded that our internal control over financial reporting was effective as of
> April 30, 2016.
>
> * * *
>
> There were no changes in our internal control over financial reporting during the
> quarter ended April 30, 2016 that have materially affected, or are reasonably
> likely to materially affect, our internal control over financial reporting.

111.     As to the Company's disclosure controls and procedures, the 2015-2016 10-K

provided:

> As of the end of the period covered by this Annual Report on Form 10-K, we
> carried out an evaluation, under the supervision and with the participation of the
> Company's management, including our Chief Executive Officer and Principal
> Financial Officer, of the effectiveness of the design and operation of our
> "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the
> Securities Exchange Act of 1934, as amended (the "Exchange Act")). Based upon
> that evaluation, the Chief Executive Officer and Principal Financial Officer
> concluded that our disclosure controls and procedures were effective to ensure
> information required to be disclosed by us in reports we file or submit under the
> Exchange Act is (1) recorded, processed, summarized and reported within the
> time periods specified in SEC rules and forms and (2) accumulated and
> communicated to our management, including our Chief Executive Officer and
> Principal Financial Officer, to allow timely decisions regarding required
> disclosure.

112.     Attached to the 2015-2016 10-K were certifications pursuant to Rule 13a-14(a)

and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants N. Caporella and Bracken attesting to the accuracy of the 2015-2016 10-K.

### *May 2017 Press Releases*

113.     On May 4, 2017, the Company issued a press release refuting a report published

that morning by Maxim Group. The press release stated, in relevant part, that:

<u>VPO – VPC Dynamics</u>
National Beverage *employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita)*. We utilize two proprietary techniques to magnify these measures and this *creates growth never before thought possible.* Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods and find before and after changes so dynamic that they demand we afford them the use of these methods as frequently as possible.

(Underlined subheading in original. Bold & italic emphasis added.)

114.   The following day, May 5, 2017, NBC issued a second press release that included a letter to shareholders written by Defendant N. Caporella. Defendant N. Caporella referenced the VPO calculator, stating, in relevant part: "Our impressive VPO calculator that was reflected on the cover of our fiscal year 2015 Proxy is flashing solid green numbers as we bring FY2017 to a close."

### 2016-2017 10-K

115.   On July 13, 2017, the Company filed an annual report with the SEC for the fiscal year and quarter ended April 29, 2017 on Form 10-K (the "2016-2017 10-K") providing the Company's financial results and position. The 2016-2017 10-K was signed by Defendants N. Caporella, Bracken, J. Caporella, Conlee, Hathorn, and Sheridan. The 2016-2017 10-K reported net revenue of $826.9 million, net income of $107 million, and diluted earnings per share of $2.29.

116.   Regarding LaCroix, the 2016-2017 10-K stated, in relevant part:

*100% naturally-essenced LaCroix® Sparkling Water,* our largest and fastest-growing brand, has set the pace in the Sparkling Water category that is rapidly becoming the alternative to traditional carbonated soda. With zero calories, zero sweeteners and zero sodium, the innocence of LaCroix has propelled it to the top-selling all natural domestic sparkling water. *Flavored with natural fruit essence, LaCroix* has the support of national chains in multiple channels, including mass merchants, mainstream supermarkets and natural and specialty food retailers and has a burgeoning social media presence.

(Emphasis added.)

117.    The 2016-2017 10-K noted that the Company's Code of Ethics is available on its

website. As noted above, the Code of Ethics prohibits, among other things, workplace

harassment.

118.    Individual Defendants caused the Company to assert in the 2016-2017 10-K that

NBC's internal control over financial reporting was effective. The 2016-2017 10-K stated:

> Our management is responsible for establishing and maintaining adequate internal
> control over financial reporting, as such term is defined in Rule 13a-15(f) of the
> Exchange Act. Under the supervision and with the participation of our
> management, including our Chief Executive Officer and Principal Financial
> Officer, we conducted an evaluation of the effectiveness of our internal control
> over
> financial reporting based on the framework in Internal Control – Integrated
> Framework issued by the Committee of Sponsoring Organizations of the
> Treadway Commission in 2013. Based on that evaluation, our management
> concluded that our internal control over financial reporting was effective as of
> April 29, 2017.
>
> * * *
>
> There were no changes in our internal control over financial reporting during the
> quarter ended April 29, 2017 that have materially affected, or are reasonably
> likely to materially affect, our internal control over financial reporting.

119.    As to the Company's disclosure controls and procedures, the 2016-2017 10-K

provided:

> As of the end of the period covered by this Annual Report on Form 10-K, we
> carried out an evaluation, under the supervision and with the participation of the
> Company's management, including our Chief Executive Officer and Principal
> Financial Officer, of the effectiveness of the design and operation of our
> "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the
> Securities Exchange Act of 1934, as amended (the "Exchange Act")). Based upon
> that evaluation, the Chief Executive Officer and Principal Financial Officer
> concluded that our disclosure controls and procedures were effective to ensure
> information required to be disclosed by us in reports we file or submit under the
> Exchange Act is (1) recorded, processed, summarized and reported within the
> time periods specified in SEC rules and forms and (2) accumulated and
> communicated to our management, including our Chief Executive Officer and
> Principal Financial Officer, to allow timely decisions regarding required
> disclosure.

120.    Attached to the 2016-2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants N. Caporella and Bracken attesting to the accuracy of the 2016-2017 10-K.

121.    The statements referenced in ¶¶ 95-120 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about NBC's business, operations and compliance policies. Specifically, those statements failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2) NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5) Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, NBC's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

122.    On December 7, 2017, NBC issued a press release titled "National Beverage Corp. Growth Accelerates on Track for Billion Dollar Revenues $504 Million – First 6 Months." The press release provided the Company's operating results for first half of the 2017-2018 fiscal year.

123.    On December 8, 2017, Anthony Vendetti of Maxim Group gave NBC shares a sell rating, as a result of, among other things, "numerous weak brands and opaque financial reporting."

124.    On this news, the price per share of NBC stock dropped from a closing price of $112.75 on December 7, 2017 to close at $100.84 per share on December 8, 2017 -- a drop of 10.6%, or $11.91.

125.    The SEC filed a letter addressed to NBC's Vice President, Controller, and Chief Accounting Officer, Gregory P. Cook ("Cook") on January 26, 2018. In the letter, the SEC requested information regarding NBC's May 2017 press releases, particularity the Company's statements regarding the Velocity Methods, VPO and VPC. The letter stated, in relevant part:

> You state that you "magnify these measures and this creates growth never before thought possible." You also state that you are "creating velocity per capita through proven velocity predictors." To the extent that VPO and VPC are key performance indicators used in managing your business, please include a discussion of these measures along with comparative period amounts or explain why you do not believe this disclosure is necessary. Refer to Section III.B.1 of SEC Release No. 33-8350.

126.    NBC filed a response letter on February 23, 2018. Signed by Cook, the letter contained the following response:

> Our Chairman & CEO wrote the following in his press release dated May 4, 2017:
>
> *"VPO – VPC Dynamics*
>
> *National Beverage employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita). We utilize two proprietary techniques to magnify these measures and this creates growth never before thought possible. Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods and find before and after changes so dynamic that they demand we afford them the use of these methods as frequently as possible."*[10]
>
> This statement characterizes the entrepreneurial spirit of National Beverage and its Chairman. The metrics that Mr. Caporella referenced are used to establish goals for certain customers, but are not utilized to manage the overall executional side of our business. Furthermore, ***we do not believe our comments relative to***

---

[10] Emphasis in original unless otherwise noted throughout.

34

***VPO/VPC dynamics require explanation as they are proprietary methods that are part of a consumer engagement program called "BrandED".*** Through this educational program that allows us direct contact with our consumers, we learn about frequency of purchase, consumption, household management and other pertinent facts at various locations and time of purchase. This information is as secretive as the formulas of our beverages and should not be disclosed to our competition.

VPO and VPC therefore are not key performance indicators that would give readers a view of the Company through the "eyes of management" as that term is used in SEC Release No. 33-8350.

(Italic and underlined emphasis in original. Bold and italic emphasis added.)

127.     The SEC responded with another letter, dated March 23, 2018, which was filed on

March 26, 2018. The SEC's letter stated, in pertinent part:

We note your response that the VPO and VPC metrics are not used to manage the execution side of your business and are not key performance indicators. However, we note the statement that you "utilize" two proprietary techniques to magnify these measures, which "creates growth never before thought possible." We also note the statement in your press release furnished May 8, 2017 that an "impressive VPO calculator that was reflected on the cover of our fiscal year 2015 Proxy is flashing solid green numbers as we bring FY2017 to a close." Please provide an expanded response that explains the VPO and VPC metrics and reconciles the statements above with the statement that VPO and VPC are not utilized to manage your business and are not key performance indicators.

128.     On the filing of the SEC's response, the price per share of NBC stock dropped

from a closing price of $87.65 on the prior trading day, March 23, 2018, to close at $85.69 per

share on March 26, 2018 -- a drop of 2.2%, or $1.96.

129.     NBC filed a letter on April 25, 2018, dated April 24, 2018, in response to the

SEC's March 23, 2018 letter. Signed by Cook, the letter contained the following response:

VPO (Velocity per Outlet) is calculated by dividing the number of units sold by a given customer during a specified time period by the number of outlets stocking the product. VPC (Velocity per Capita) is calculated by dividing the number of units sold in a given geographic area by the population of the area.

VPO metrics are used to establish goals for certain customers, identify poor performing stores, and, when combined with proprietary customer survey data, utilized to give customers better insight into their consumers. Such data is collected only for certain customers and cannot practically be used to establish

goals or targets for the Company as a whole, nor can VPO data be applied to every customer. As a result, such metrics are used primarily for brand planning and execution for specific customers.

The Company uses VPC data primarily to quantify the average number of beverages by category that people consume each year in the United States. VPC highlights the opportunity for growth by comparing per capita consumption of sparkling water in the United States to that of other developed markets. As such, VPC data is often incorporated in customer sales presentations.

Although VPO and VPC are components in marketing and evaluating performance by customer, the data underlying these metrics is proprietary, and we believe the results of this use and the performance of our brands justify the use of the descriptions included in our press releases. This data, as compiled and used by our marketing section, would not give readers a view of the Company through the "eyes of management" as that term is used in SEC Release No. 33-8350.

130.    After markets closed on May 14, 2018, the SEC filed a letter addressed to Cook,

stating:

We have completed our review of your filing. We remind you that the company and its management are responsible for the accuracy and adequacy of their disclosures, notwithstanding any review, comments, action or absence of action by the staff.

131.    After markets closed on June 26, 2018, *The Wall Street Journal* published an

article regarding the correspondence between NBC and the SEC, titled "The SEC Has Had Its

Own Questions About LaCroix." The article began by reporting:

LaCroix maker National Beverage Corp. is known for issuing colorful news releases peppered with exclamation points, outsize boasts and attacks on critics.

Two of those releases recently caught the attention of the Securities and Exchange Commission, which in January asked the flavored seltzer company to clarify what its billionaire chairman and chief executive, Nick Caporella, meant when he wrote that the company had "magnified" two proprietary sales metrics to create "growth never before thought possible."

In the first of the two releases, dated May 4, 2017, Mr. Caporella wrote: "National Beverage employs methods that no other company does in this area – VPO (velocity per outlet) and VPC (velocity per capita)… Unique to National Beverage is creating velocity per capita through proven velocity predictors. Retailers are amazed by these methods."

The following day, a release described a VPO calculator "flashing solid green numbers as we bring FY2017 to close."

132.    The article continued, discussing the correspondence between the SEC and NBC:

*The SEC asked the Fort Lauderdale, Fla.-based company to provide "a discussion of these measures along with comparative amounts or explain why you do not believe this disclosure is necessary,"* according to securities filings.

*In correspondence with the agency* disclosed in those filings, *National Beverage declined to provide the requested figures*.

"This information is as secretive as the formulas of our beverages and should not be disclosed to our competition," Gregory Cook, the company's controller, wrote in a response to the SEC. The metrics are used to set goals for certain customers and not for the company as a whole, he added. The agency said in May that it had completed its review of the matter.

(Emphasis added.)

133.    On this news, the price per share of NBC stock dropped from a closing price of $109.94 on June 26, 2018 to close at $100.19 per share on June 27, 2018 -- a drop of 8.9%, or $9.75.

134.    On July 3, 3018, *The Wall street Journal* published another article on NBC, this time detailing the Hostile Work Environment Misconduct. That article, titled "Billionaire Behind LaCroix Accused of Improper Touching by Two Pilots," stated, in relevant part:

Two pilots have filed lawsuits alleging sexual harassment by the billionaire behind LaCroix sparkling water, *claiming 82-year-old Nick A. Caporella inappropriately touched them on multiple trips while they were flying with him in the cockpit of his business jet*.

The allegations by the former employees, both men, were made in *lawsuits* filed in the past two years in Florida and *name both the chief executive and National Beverage Corp.* [] *as defendants*. Mr. Caporella is the chairman, chief executive and controlling shareholder of National Beverage, which has a market value of $5 billion, thanks to surging LaCroix sales.

Mr. Caporella, a rare CEO who also pilots the corporate jet, and the company have denied the allegations in court documents. *The suits claim the unwanted touching occurred on more than 30 trips from 2014 to 2016*.

(Emphasis added.)

135.    Regarding the Company's reaction and airplane in question, the article stated, in

relevant part:

> "There is no truth to any of the allegations and nothing remotely akin to the
> alleged events occurred," the company said in a news release after The Wall
> Street Journal article was published online. ***Samuel Hathorn, chairman of
> National Beverage's audit committee, added that "the board is aware of the
> allegations and knows them to be untrue, based on our knowledge of Mr.
> Caporella and the investigation that was conducted."***
>
> ***The business jet, a twin-engine Falcon 2000EX, flew regularly during the
> period in question from National Beverage's home city of Fort Lauderdale,
> Fla., to destinations including*** Portsmouth, N.H., Oakland, Calif., and ***Los
> Cabos, Mexico, according to federal flight records.*** The travel matches the dates
> of trips alleged in the two suits.

(Emphasis added.)

136.    Regarding the Huenefeld Action, the article stated, in relevant part:

One lawsuit was filed by pilot Terence Huenefeld and his wife. Mr. Huenefeld,
who spent about five months working for Mr. Caporella, accused the CEO of
unwanted touching on 18 flights between March and July 2016, according to
court documents.

The lawsuit alleged Mr. Caporella engaged in "repeated unjustified, unwarranted
and uninvited grabbing, rubbing and groping of Terry's leg in a sexual manner,
reaching up towards Terry's sexual organs."

137.    Regarding the Citrullo Action, the article stated, in relevant part:

The second pilot, Vincent Citrullo, alleged in his lawsuit a similar pattern of
behavior during more than a year flying alongside Mr. Caporella. The lawsuit
claims that on 14 flights from March 2014 to July 2015, Mr. Caporella engaged in
unwanted touching, including grabbing Mr. Citrullo under his armpit, under his
thigh and moving his right hand up Mr. Citrullo's left leg towards his genitals.

Reached by phone Tuesday, Mr. Citrullo said he stands by his allegations "100%.
It was definitely inappropriate."

138.    Numerous other news outlets also picked up the story on July 3, 2018, including

Business Insider, Vox, and Fortune.

139.    On this news, the price per share of NBC stock dropped from a closing price of

$109.94 on July 3, 2018 to close at $107.04 per share on July 6, 2018 -- a drop of 2.6%, or $2.90.

**False and Misleading Statements Continue**

*NBC's Denials of the Hostile Work Environment Misconduct*

140.    After *The Wall Street Journal*'s July 3, 2018 article was published online, the

Individual Defendants caused NBC to issue a press release that very day denying the Hostile

Work Environment Misconduct. The press release stated, in relevant part:

> National Beverage Corp. and Nick Caporella completely and unequivocally deny
> the allegations recited in today's Wall Street Journal.
>
> ***"There is no truth to any of the allegations and nothing remotely akin to the
> alleged events occurred," the Company stated***. "The allegations, which were
> lifted from employment-related lawsuits filed by two former associates, are
> contrary to the statements of many others who have known and flown with Mr.
> Caporella for decades. The Journal reporter chose to recklessly disregard
> documentary evidence that refuted the allegations that were the subject of the
> report."
>
> ***Samuel Hathorn, chairman of the Company's Audit Committee, stated, "The
> Board is aware of the allegations and knows them to be untrue, based on our
> knowledge of Mr. Caporella and the investigation that was conducted."***

(Emphasis added.)

141.    On July 5, 2018, the Individual Defendants caused the Company to issue a second

press release refuting the July 3, 2018 article in *The Wall Street Journal*. That press release

stated, in relevant part:

> The Board of Directors has authorized management to retain defamation counsel
> to advise the Company on its legal options with regard to the July 3, 2018 article
> published by the Wall Street Journal and will notice the Journal's counsel about
> this false and misleading "report" immediately.
>
> As set forth in our July 3 press release, National Beverage believes that the article
> improperly portrays unsubstantiated allegations that were contained in
> employment-related lawsuits as facts, and disregarded documents and other
> evidence which clearly refute the allegations. This biased and sensationalized

"reporting", which was reposted by numerous other media organizations, has the potential to cause economic and reputational harm.

\* \* \*

**Board Member Cecil D. Conlee stated "I have known Nick for over 40 years and I find these allegations to be incredulous."**

(Emphasis added.)

*2018 Proxy Statement*

142.    On August 27, 2018, the Company filed the 2018 Proxy Statement. Defendants N. Caporella, J. Caporella, Conlee, Hathorn, and Sheridan solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

143.    Regarding compensation received by Defendant Caporella, the 2018 Proxy Statement provided, in relevant part:

 CMA, pursuant to a management agreement, provides the services of and compensates the Company's Chief Executive Officer, Chief Financial Officer and senior and other corporate personnel who provide management, administrative and creative functions to the Company. Although management fees paid to CMA have been disclosed in "Certain Relationships and Related Party Transactions" since the inception of the management agreement in 1992, during 2009, the Commission requested that we modify the presentation of amounts paid to Mr. Nick A. Caporella and Mr. Bracken. In a comment letter dated February 9, 2009, the Commission staff requested that, due to Mr. Caporella's 100% ownership of CMA, the entire management fee paid to CMA be reflected as compensation to Mr. Caporella in the body of the Summary Compensation Table. As a result, we agreed (for reporting purposes) to include the management fee paid by the Company to CMA under the caption "All Other Compensation" with respect to Mr. Nick A. Caporella in the Summary Compensation Table. **We believe this method of reporting is misleading and could lead the reader to construe that these amounts are paid by the Company or CMA directly to Mr. Nick A.**

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Caporella. The amounts paid by the Company to CMA, as reflected in the Summary Compensation Table, should not be interpreted as the actual amount of compensation paid to Mr. Nick A. Caporella by either the Company or CMA and are shown only to comply with the comment letter dated February 9, 2009.** The cash compensation of Mr. Bracken, who serves as Principal Financial Officer of National Beverage Corp., is also paid by CMA and is included under the "All Other Compensation" caption in the Summary Compensation Table. (See "Certain Relationships and Related Party Transactions".)

144.    Thus, the 2018 Proxy Statement failed to disclose compensation received by Defendant N. Caporella in the form of use of the Falcon 2000 jet for personal travel at the Company's expense, in contravention of the Code of Ethics.

145.    With respect to the Company's "Certain Relationships and Related Party Transactions," the 2018 Proxy Statement disclosed:

The Company is a party to a management agreement with CMA, a corporation owned by our Chairman and Chief Executive Officer. This agreement was originated in 1991 for the efficient use of management of two public companies at the time. In 1994, one of those public entities, through a merger, no longer was managed in this manner.

Under the terms of the management agreement, CMA provides, subject to the direction and supervision of the Board of Directors of the Company, (i) senior corporate functions (including supervision of the Company's financial, legal, executive recruitment, internal audit and management information systems departments) as well as the services of a Chief Executive Officer and Chief Financial Officer, and (ii) services in connection with acquisitions, dispositions and financings by the Company, including identifying and profiling acquisition candidates, negotiating and structuring potential transactions and arranging financing for any such transaction. CMA, through its personnel, also provides, to the extent possible, the stimulus and creativity to develop an innovative and dynamic persona for the Company, its products and corporate image. In order to fulfill its obligations under the management agreement, CMA employs numerous individuals, who, acting as a unit, provide management, administrative and creative functions for the Company. In connection with providing services under the management agreement, CMA is a twenty percent (20%) joint owner of an aircraft used by the Company. The management agreement provides that the Company will pay CMA an annual base fee equal to one percent of the consolidated net sales of the Company, and further provides that the Compensation and Stock Option Committee and the Board of Directors may from time to time award additional incentive compensation to CMA. The Board of Directors on numerous occasions contemplated incentive compensation and,

while shareholder value increased to over $4.8 billion (or 11,000%) since the inception of this agreement, no incentive compensation has been paid. We incurred management fees to CMA of $9.8 million for Fiscal 2018, $8.3 million for Fiscal 2017, and $7.0 million for Fiscal 2016. The Company does not have written policies and procedures with respect to related party transactions, but the Company's practice has been that the services and performance of CMA are reviewed annually by the independent members of the Compensation and Stock Option Committee and the Board of Directors. During the course of such reviews, the independent directors on the Compensation and Stock Option Committee have, on numerous occasions, proposed that CMA be paid an incentive due to superior performance based on various criteria, including the favorable outcome of specific negotiations and the performance of the Company's Common Stock. During the April 20, 2018 Board meeting, the Chairman of the Compensation Committee initiated a broad discussion concerning expediting an incentive plan for CMA, especially considering the Company's exceptional performance over the past several years. However, no incentive compensation has been accepted by CMA and, as noted above, none has been paid since the inception of the management agreement.

(Emphasis added.)

146.    Thus, despite the ostensibly ongoing nature of the Company's relationship with Broad River, whose President and Vice President and Defendants N. Caporella and Bracken, respectively, the 2018 Proxy Statement failed to disclose any related party transactions with, or the existence of, Broad River.

147.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

148.    Further, the 2018 Proxy Statement failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2) NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment

by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the

Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5)

Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet

for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable

basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the

foregoing, NBC's public statements were materially false and misleading at all relevant times.

### *2017-2018 10-K*

149.    On July 27, 2017, the Company filed an annual report with the SEC for the fiscal

year and quarter ended April 28, 2018 on Form 10-Q (the "2017-2018 10-K") providing the

Company's financial results and position. The 2017-2018 10-K was signed by Defendants N.

Caporella, Bracken, J. Caporella, Conlee, Hathorn, and Sheridan. The 2017-2018 10-K reported

net revenue of $975.7 million, net income of $149.8 million, and diluted earnings per share of

$3.19.

150.    The 2017-2018 10-K noted that the Company's Code of Ethics is available on its

website. As noted above, the Code of Ethics prohibits, among other things, workplace

harassment.

151.    Regarding LaCroix sparkling water, the 2017-2018 10-K stated, in relevant part:

> **100% naturally-essenced LaCroix® Sparkling Water**, our most significant and
> dominant brand, has uniquely redefined the Sparkling Water category that is
> rapidly becoming the alternative to traditional carbonated soda. With *zero*
> calories, *zero* sweeteners    and *zero* sodium,    the *innocence* of    LaCroix    has
> propelled it to the top-selling domestic sparkling water. **Naturally essenced,**
> **LaCroix** has gained the support of national retailers in multiple channels,
> including mass merchants, mainstream supermarkets and natural and specialty
> food retailers.

(Italics in original. Bold & italic emphasis added.)

152.    Individual Defendants caused the Company to assert in the 2017-2018 10-K that

NBC's internal control over financial reporting was effective. The 2017-2018 10-K stated:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) of the Exchange Act. Under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of April 28, 2018.

\* \* \*

There were no changes in our internal control over financial reporting during the quarter ended April 28, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

153.    As to the Company's disclosure controls and procedures, the 2017-2018 10-K provided:

As of the end of the period covered by this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")). Based upon that evaluation, the Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective to ensure information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Principal Financial Officer, to allow timely decisions regarding required disclosure.

154.    Attached to the 2017-2018 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants N. Caporella and Bracken attesting to the accuracy of the 2017-2018 10-K.

155.    The statements referenced in ¶¶ 140, 141, and 149-154 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about NBC's business, operational and compliance policies. Specifically, those statements failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2)

NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5) Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, NBC's public statements were materially false and misleading at all relevant times.

156.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

157.    Moreover, the Individual Defendants breached their fiduciary duties by willfully or recklessly failing to correct and causing the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein.

158.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly failed to maintain internal controls.

## **DAMAGES TO NBC**

159.    As a direct and proximate result of the Individual Defendants' conduct, NBC has lost and will continue to lose and expend many millions of dollars.

160.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its Executive Vice President – Finance, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

161.    Such expenditures include, but are not limited to, legal fees and settlement amounts associated with the Misconduct Actions filed against the Company and its CEO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.    Such expenditures include, but are not limited to, legal fees and settlement amounts associated with the Consumer Class Action filed against the Company, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

163.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company. Such benefits include expending Company funds on Defendant N. Caporella's private trips on the Falcon 2000 jet, while the Individual Defendants caused the Company to fail to disclose that such trips were part of the compensation received by Defendant N. Caporella.

164.    Such expenditures included, but are not limited to, "bonuses" paid to employees of NBC after such employees suffered harassment from Defendant N. Caporella.

165.    As a direct and proximate result of the Individual Defendants' conduct, NBC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

166.    Plaintiff brings this action derivatively and for the benefit of NBC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of NBC, unjust enrichment, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

167.    NBC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

168.    Plaintiff is, and has been at all relevant times, a shareholder of NBC. Plaintiff will adequately and fairly represent the interests of NBC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

169.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

170.    A pre-suit demand on the Board of NBC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five directors: Defendants N. Caporella, J. Caporella, Conlee, Hathorn, and Sheridan (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five directors who are on the Board at the time this action is commenced.

171.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to engage in the Hostile Work Environment Misconduct and to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

172.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly engaged in or permitted the Hostile Work Environment Misconduct, and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

173.    Additional reasons that demand on Defendant N. Caporella is futile follow. Defendant N. Caporella is the Company's CEO and Chairman, and is thus, as the Company acknowledges, a non-independent director. Indeed, he receives many millions of dollars in compensation from the Company annually. The amount set forth with respect to Defendant N. Caporella under the caption "All Other Compensation" represents the total management fees paid to CMA. For the fiscal year ended April 28, 2018, CMA received $9,757,340 in management fees from the Company. Without further disclosure from the Company and considering Defendant N. Caporella's 100% ownership of CMA, it is not unreasonable to assume that Defendant N. Caporella received a large portion of these management fees. As CEO and Company Chairman, Defendant N. Caporella conducted little, if any, oversight of the Company's scheme to make false and misleading statements, engaged in the Hostile Work Environment Misconduct, awarded himself undisclosed travel perquisites, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a 73.4% controlling shareholder, Defendant N. Caporella was ultimately responsible for all of the wrongful conduct described herein, including the Hostile Work Environment Misconduct (which he personally

engaged in), the Company's engagement in undisclosed transactions, the Company's operations and internal controls, and all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, all of which he signed. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Moreover, Defendant N. Caporella is a defendant in the Securities Class Action and is or was a defendant in each of the Misconduct Actions. Indeed, Defendant N. Caporella's own actions gave rise to the Misconduct Actions. Defendant N. Caporella conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the schemes described herein, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, too, Defendant N. Caporella breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant J. Caporella is futile follow. Defendant J. Caporella is a long-time Company director and has served as President of the Company since September 2002 and COO since 2014. Thus, as the Company admits, he is a non-independent director. He receives handsome compensation, including $1,445,887 in the fiscal year ended April 28, 2018. As President, COO, and a long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Hostile Work Environment Misconduct, and provide Defendant N. Caporella undisclosed travel perquisites, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant J. Caporella is also the son of

Defendant N. Caporella, and thus cannot disinterestedly consider a demand to take action against himself and the other Directors as he his beholden to his father, who is named as a defendant in the Securities Class Action and is or was a defendant in each of the Misconduct Actions. Moreover, Defendant J. Caporella signed or personally made many of the false statements and omissions of material fact that are alleged herein, including in the 2013-2014 10-K, 2014-2015 10-K, 2015-2016 10-K, and 2016-2017 10-K, all of which he signed. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant J. Caporella breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Hathorn is futile follow. Defendant Hathorn has served as a Company director since 1997 and is the Chair of the Audit Committee and Deputy Chair of the Compensation and Stock Option Committee. As a long-time Company director, Chair of the Audit Committee, and Deputy Chair of the Compensation and Stock Option Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Hostile Work Environment Misconduct, and provide Defendant N. Caporella undisclosed travel perquisites, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hathorn also was the maker of many of the false statements and omissions of material fact that are alleged herein, including in the 2013-2014 10-K, 2014-2015 10-K, 2015-2016 10-K, and 2016-2017 10-K, all of which he signed. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant

Hathorn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Sheridan is futile follow. Defendant Sheridan has served as a Company director since 2009 and is the Deputy Chair of the Audit Committee and a member of the Compensation and Stock Option Committee. As a long-time Company director, Deputy Chair of the Audit Committee, and member of the Compensation and Stock Option Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Hostile Work Environment Misconduct, and provide Defendant N. Caporella undisclosed travel perquisites, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sheridan also was the maker of many of the false statements and omissions of material fact that are alleged herein, including in the 2013-2014 10-K, 2014-2015 10-K, 2015-2016 10-K, and 2016-2017 10-K, all of which he signed. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Sheridan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Conlee is futile follow. Defendant Conlee has served as a Company director since 2009 and is a member of the Audit Committee and Chair of the Compensation and Stock Option Committee. As a long-time Company director, member of the Audit Committee, and Chair of the Compensation and Stock Option Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, engage in the Hostile Work Environment Misconduct, and provide

Defendant N. Caporella undisclosed travel perquisites, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Conlee also was the maker of many of the false statements and omissions of material fact that are alleged herein, including in the 2013-2014 10-K, 2014-2015 10-K, 2015-2016 10-K, and 2016-2017 10-K, all of which he signed. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Conlee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on the Board is futile follow.

179.    Demand in this case is excused because the Directors are beholden to and controlled by Defendant N. Caporella, who controls the Company by virtue of his share ownership, which provided him with approximately 73.4% of the Company's outstanding shares as of August 13, 2018. These shareholdings provide Defendant N. Caporella with significant control over the continued employment of the remaining Directors, especially Defendant J. Caporella, who is both a well-compensated executive of NBC and Defendant N. Caporella's son. Indeed, as revealed in the Huenefeld Action and in an action filed by former long-time associate of Defendant N. Caporella, David Mursten, Defendant N. Caporella removes those who he perceives to be acting against him without hesitation.[12] Defendants Conlee, Hathorn, and Sheridan are also beholden to Defendant N. Caporella because of the compensation they receive as Directors, including through stock options and awards.[13] Thus, the Directors are unable to

---

[12] *Mursten v. Caporella*, Docket No. 0:12-cv-62474 (S.D. Fla.), filed December 12, 2012.

[13] In addition to share based awards under the Company's 1991 Omnibus Incentive Plan, officers and directors of NBC are awarded share based compensation under NBC's Key Employee

evaluate a demand with disinterest or independence as a result of Defendant N. Caporella's control over them, his substantial likelihood of liability in the Securities Class Action and of all of the Directors in the present action, and therefore, demand is excused.

180.    All of the Directors benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of NBC stock and stock options held by the Directors.

181.    The Board's unwillingness to impartially consider a demand related to the Hostile Work Environment Misconduct is revealed by the Company's July 5, 2018 press release, wherein the Company revealed that: "[t]he Board of Directors has authorized management to retain defamation counsel to advise the Company on its legal options with regard to the July 3, 2018 article published by the Wall Street Journal and will notice the Journal's counsel about this false and misleading 'report' immediately." Thus, all of the Directors have demonstrated an unwillingness to impartially evaluate the Hostile Work Environment Misconduct, and therefore, demand is excused as to all of the Directors.

182.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors

---

Equity Partnership Program (the "KEEP Program"). As stated in the 2018 Proxy Statement, under the KEEP Program:

> Participants who purchase shares of Common Stock in the open market receive grants of stock options equal to 50% of the number of shares purchased up to a maximum of 6,000 shares purchased in any two-year period. Options under the KEEP Program are automatically forfeited upon the sale of shares originally acquired by the participant. The options are granted at an initial exercise price of 60% of the purchase price paid for the shares acquired and reduce to the par value of Common Stock at the end of the six-year vesting period.

from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

183.    Defendants N. Caporella, Conlee, and Hathorn have personal and professional connections dating back decades through Burnup & Sims Inc. ("Burnup"), a former affiliate of NBC. Defendant N. Caporella was Burnup's CEO and President for from 1976 to 1994, and Chairman of the Board from 1979 to 1994. Defendant Hathorn served as a director of Burnup from 1981 to 1997. Defendant Conlee was a director of Burnup for more than twenty years. Upon information and belief, Defendants N. Caporella, Conlee, and Hathorn have developed personal and professional connections over the past several decades that prevent them from evaluating a demand with independence, especially in light of the substantial likelihood of liability that Defendant N. Caporella faces in the Securities Class Action. Therefore, demand is excused as to Defendants N. Caporella, Conlee, and Hathorn.

184.    Further, Defendant Sheridan was employed by Faygo Beverages, Inc. ("Faygo") from 1974 until his retirement in 2004. Faygo was acquired by NBC in 1987, at which time Defendant Sheridan was  promoted from Chief Financial Officer of Faygo to President of Faygo. Upon information and belief, Defendants N. Caporella and Sheridan have developed personal and professional connections over their decades-long working relationship that prevent them from evaluating a demand with independence, especially in light of the substantial likelihood of liability that Defendant N. Caporella faces in the Securities Class Action, and therefore, demand is excused as to Defendants N. Caporella and Sheridan.

185.    Due to the advanced age of Defendants Conlee (82), Hathorn (75), and Sheridan (75), and their decades long associations with Defendant N. Caporella, Defendants Conlee, Hathorn, and Sheridan are more willing to risk their reputations than their relationships with

Defendant N. Caporella, who faces a substantial likelihood of liability in the Securities Class Action. Indeed, Defendants Hathorn and Conlee have personally defended Defendant N. Caporella regarding the Hostile Work Environment Misconduct and thereby evidenced their unwillingness to impartially consider a demand on the Board related to the Hostile Work Environment Misconduct. In a July 3, 2018 NBC press release, Defendant Hathorn stated that "The Board is aware of the allegations and knows them to be untrue, based on our knowledge of Mr. Caporella and the investigation that was conducted." Further, Defendant Conlee stated in a July 5, 2018 NBC press release regarding the Hostile Work Environment Misconduct that "I have known Nick for over 40 years and I find these allegations to be incredulous."

186.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in Hostile Work Environment Misconduct and issuance of materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act. The Directors also violated the Code of Ethics by retaliating against individuals who reported violations of the Code of Ethics, or allowed such retaliation to occur. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

187.    Defendants Sheridan, Hathorn, and Conlee (the "Audit Committee Defendants") serve on the Company's Audit Committee. Pursuant to the Audit Committee Charter, Audit

Committee Defendants were responsible for reviewing the effectiveness of the Company's internal controls, and ensuring compliance with the Company's Code of Ethics. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

188.    As members of the Compensation and Stock Option Committee, Defendants Conlee, Hathorn, and Sheridan (the "Compensation Committee Defendants") were responsible for reviewing all compensation arrangements, including that of Defendant N. Caporella. The 2018 Proxy Statement provides that:

> The principal functions of the Compensation and Stock Option Committee are to consider, review and approve all compensation arrangements, including base salary, annual incentive awards and stock option grants, for officers and employees of the Company and to administer the Company's employee benefit programs. The Compensation and Stock Option Committee does not have a charter.

As a result of the Compensation Committee's failures of management and oversight over the awarding and reporting of Defendant N. Caporella's compensation, in particular travel benefits provided to Defendant N. Caporella, the Compensation Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

189.    NBC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for NBC any part of the damages NBC suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

190.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

191.     The acts complained of herein constitute violations of fiduciary duties owed by NBC's officers and directors, and these acts are incapable of ratification.

192.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of NBC. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of NBC, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

193.     If there is no directors' and officers' liability insurance, then the Directors will not cause NBC to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

194.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

195.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

197.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

198.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

199.   Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2) NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5) Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, NBC's public statements were materially false and misleading at all relevant times.

200.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's share price was artificially inflated.

201.   Further, the Individual Defendants also caused the 2018 Proxy Statement to be false and misleading by reporting the total amount paid to CMA as Defendant N. Caporella's compensation, while failing to disclose benefits received by N. Caporella in the form of air travel on the Company's jet for personal purposes paid for by NBC.

202.    The Individual Defendants further caused the 2018 Proxy Statement to be false and misleading by disclosing arrangement with CMA as a related party transaction, while failing to disclose transactions with, or the existence of, Broad River.

203.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

204.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

205.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NBC's business and affairs.

207.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

208.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NBC.

209.    In breach of their fiduciary duties owed to NBC, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Defendant N. Caporella engaged in the Hostile Work Environment Misconduct; (2) NBC has paid informal "settlements," in the form of bonuses, to NBC employees who have been subject to harassment by Defendant N. Caporella; (3) the Company engaged in the Marketing Misconduct; (4) the Company engaged in unreported related party transactions with Broad River Aviation, Inc.; (5) Defendant N. Caporella receives undisclosed compensation, including use of the Company's jet for his personal ends; (6) the Company's claims about the Velocity Methods had no verifiable basis in fact; (7) the Company failed to maintain internal controls; and (8) as a result of the foregoing, NBC's public statements were materially false and misleading at all relevant times.

210.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

211.    In further breach of their fiduciary duties owed to NBC, Defendant N. Caporella engaged in the Hostile Work Environment Misconduct, while the remaining Individual Defendants willfully or recklessly allowed the Hostile Work Environment Misconduct to occur and continue.

212.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

213.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NBC's securities, and disguising insider transactions.

214. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NBC's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

215. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

216. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NBC has sustained and continues to sustain significant damages.

217. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218. Plaintiff on behalf of NBC has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

219.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

220.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NBC.

221.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from NBC that was tied to the performance or artificially inflated valuation of NBC, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

222.    Defendant N. Caporella received undisclosed and unwarranted benefits in the form of air travel on the Company's jet, paid for by NBC.

223.    Plaintiff, as a shareholder and a representative of NBC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

224.    Plaintiff on behalf of NBC has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    As a result of the foregoing, the Company incurred legal and settlement costs associated with the Misconduct Actions.

227.    As a result of the foregoing, the Company incurred the costs of paying "bonuses" to employees of NBC who were subjected to harassment by Defendant N. Caporella.

228.    Further, the Company incurred the costs of Defendant N. Caporella's personal travel on the Company's jet, without disclosing that Defendant N. Caporella receives such benefits.

229.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

230.    Plaintiff on behalf of NBC has no adequate remedy at law.

<b><u>PRAYER FOR RELIEF</u></b>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of NBC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to NBC;

(c)    Determining and awarding to NBC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing NBC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NBC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following

resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of NBC to nominate at least three candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)    Awarding NBC restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: November 2, 2018

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*